State of New York
Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 28
The People &c.,
        Respondent,
    v.
Thomas P. Perdue,
        Appellant.

Carolyn Walther, for appellant.
Martin P. McCarthy, for respondent.

SINGAS, J.:

"The importance of identification evidence is, of course, self-evident" (*People v Riley*, 70 NY2d 523, 530 [1987]).  In every trial, the People bear the burden of proving beyond a reasonable doubt that the defendant is the person who committed the charged

- 1 -

crime. But because identification evidence may bear certain "weaknesses and dangers," this Court has implemented "constitutional, statutory[,] and decisional safeguards" to ensure the reliability of this "most potent evidence" (*id.* at 530, 531).

On this appeal, we are asked whether a witness was properly allowed to identify defendant Thomas Perdue as the perpetrator for the first time in court, without having been subjected to any pretrial identification procedure. We hold that, when the People call a witness who may make a first-time, in-court identification, they must ensure that the defendant is aware of that possibility as early as practicable so that the defendant has a meaningful opportunity to request alternative identification procedures. If the defendant explicitly requests such procedures, a trial court may exercise its discretion to fashion any measures necessary to reduce the risk of misidentification. The ultimate determination of whether to admit a first-time, in-court identification, like any evidence, rests within the evidentiary gatekeeping discretion of the trial court. The court must balance the probative value of the identification against the dangers of misidentification and other prejudice to the defendant.

Here, defendant was aware from pre-trial discovery that the witness might make a first-time, in-court identification but sought only preclusion of the identification. Because the witness's testimony and pretrial statements established the reliability of her first-time, in-court identification, and the lack of formal notice did not significantly prejudice defendant, the trial court did not abuse its discretion in denying defendant's request to preclude it. We therefore affirm.

## I.

In 2017, defendant shot the victim in the leg during a house party. A neighbor, the witness at issue in this case, called 911 to report the shooting. On the call, the witness described the shooter as a Black, skinny, dark-skinned man, wearing a white baseball cap, gray pants, and white sneakers. After law enforcement responded to the scene, the witness told officers that she could identify the shooter if necessary. Her statements to police were captured on video recorded by an officer's body camera video, which was provided to defendant before trial. No pretrial identification procedure was conducted with this witness.

At trial, the victim testified and identified defendant as the person who shot him. The witness subsequently testified that, on the night of the shooting, there was a light on the front porch that illuminated the front of the house where the shooting took place. She stated that she saw the shooter standing right outside the house, "right there by the grass, right there by the walkway, in my plain view sight, out of my window." She further testified that the shooter was a dark-skinned Black man, approximately six feet tall, with a mustache and a goatee, and was wearing gray jeans, white sneakers, and a white cap. The People asked whether the witness "would . . . recognize" the individual if [she] saw [him] again and the witness answered, "Of course."

Defendant objected, protesting that the witness did not participate in a pretrial identification procedure. Defendant asked the court to preclude the witness's first-time, in-court identification, arguing that the identification procedure was suggestive because there was only one person sitting in the court room who could possibly be the suspect. The

court ruled that "if [the witness] can ID [defendant] in court, she can ID him in court" and that defendant could challenge the identification on cross-examination. The witness then identified defendant as the shooter. She also pointed out the shooter and the victim in surveillance video. On cross-examination, the witness testified that she had never seen the shooter before the night of the shooting and that, despite speaking to the police and to the prosecutor, she was never asked to identify defendant prior to trial. During his closing argument, defendant vigorously attacked the in-court identification.

The jury convicted defendant of all charges and the Appellate Division affirmed the judgment (*see* 203 AD3d 1638 [4th Dept 2022]). A Judge of this Court granted defendant leave to appeal (*see* 38 NY3d 1073 [2022]).

## II.

This Court has recognized the very real danger of wrongful convictions presented by mistaken eyewitness identification and has taken steps to protect criminal defendants from such miscarriages of justice (*see People v Boone*, 30 NY3d 521 [2017]; *People v Marshall*, 26 NY3d 495 [2015]; *People v Santiago*, 17 NY3d 661, 669 [2011]; *see also Riley*, 70 NY2d at 530-531). Most of this Court's rules "imposing constitutional limits on identification procedures[ ] involve[ ] suggestiveness originating with law enforcement officers" (*People v Marte*, 12 NY3d 583, 586 [2009], citing *People v Adams*, 53 NY2d 241, 251 [1981]). The concern is that suggestive pretrial identification procedures arranged by law enforcement will influence and taint the witness's subsequent in-court identification of the defendant, resulting in possible misidentification (*see Riley*, 70 NY2d at 530-531). To address that concern, this Court has generally precluded in-court identifications made

following an unduly suggestive pretrial identification procedure, allowing a witness to make an in-court identification only if the People can demonstrate an independent source for the witness's identification that was not influenced by the suggestive pretrial procedure (*id.* at 531-532; *Adams*, 53 NY2d at 251).[1] We have also recognized the possibility that trial courts might need to take protective procedures when the suggestiveness of a pretrial procedure does not originate with law enforcement (*see Marshall*, 26 NY3d at 498; *see also Marte*, 12 NY3d at 589-590).

Concerning identifications made at trial, this Court and many others have recognized the inherent suggestiveness of the traditional in-court identification procedure, with a single defendant sitting at a table with defense counsel (*see e.g. Perry v New Hampshire*, 565 US 228, 244 [2012]; *People v White*, 73 NY2d 468, 474-475 [1989]; *United States v Archibald*, 734 F2d 938, 941-942 [2d Cir 1984], *mod* 756 F2d 223 [2d Cir 1984]; *People v James*, 100 AD2d 552, 553 [2d Dept 1984]; *People v Huggler*, 50 AD2d 471, 474 [3d Dept 1976]). As with an unduly suggestive pretrial identification, it will often be immediately clear to the witness who the accused defendant is, especially if the witness has a rudimentary knowledge of courtroom seating arrangements. The principal danger is that, faced with the pressures of testifying at trial, the witness will identify the defendant as the perpetrator simply because the defendant is sitting in the appropriate spot, and not

---

[1] When considering whether an independent source exists, we have focused on independent indicia of the identification's reliability (*see People v Brisco*, 99 NY2d 596, 597 [2003]; *People v Williams*, 85 NY2d 868, 869 [1995]; *see also Neil v Biggers*, 409 US 188, 199-200 [1972]).

because the witness recognizes the defendant as the same person that they observed during the crime. Inasmuch as the traditional courtroom seating arrangement may itself suggest to the witness who should be identified, trial courts must be vigilant to ensure that where a witness has not previously identified the defendant in a properly conducted pretrial identification procedure such as a photo array or lineup, the suggestiveness of a first-time, in-court identification procedure does not create an unreasonable danger of a mistaken identification.

That defense counsel may cross-examine a witness on the suggestiveness of a first-time, in-court identification, or make such arguments to the jury, does not render an in-court identification less suggestive and does not always eliminate the risk that a jury may credit a tainted identification. We have recognized that "[a]n eyewitness is often utterly confident about an identification, expressing the identification or recollection of identification with subjective certainty, and hence entirely unshakable on cross-examination" (*Boone*, 30 NY3d at 531). Thus, to counteract the heightened risk of misidentification in the first-time, in-court identification context, defendants should be afforded a meaningful opportunity to request additional procedures that would (1) demonstrate the reliability of a subsequent in-court identification—such as granting an adjournment for a non-suggestive identification procedure to test the witness's identification (*see United States v Brown*, 699 F2d 585, 593-594 [2d Cir 1983])—or (2) reduce the suggestiveness of the in-court identification procedure itself (*see Archibald*, 734 F2d at 941-942). The determination of whether and to what extent such procedures are necessary "to enhance the truth finding process, and to prevent wrongful convictions"

(*Marte*, 12 NY3d at 586) rests within the sound discretion of the trial court (*see People v Brown*, 28 NY3d 392, 409 [2016]).[2]

Of course, the ability of the defendant to meaningfully request such protective measures is dependent on the defendant's awareness that the witness may make a first-time, in-court identification. Indeed, if a defendant is unaware before the witness testifies that the witness may make such an identification, the reliability of any subsequent alternative identification procedure, or any measures to minimize suggestiveness, would be vitiated by the witness's opportunity to observe the defendant at the defense table (*cf. Archibald*, 756 F2d at 223 [availability of special identification procedures contingent on a defendant requesting such procedures "in a timely manner prior to trial"]). Accordingly, when the People may ask a witness to make a first-time, in-court identification, they must ensure that the defendant is aware of this possibility as early as practicable. We emphasize that the court's obligation to take any action regarding a first-time, in-court identification is dependent upon a timely request made by the defendant, as the defendant may not wish

---

[2] We agree with the dissent that a trial court should consider the witness's degree of familiarity with the defendant when determining whether such procedures are necessary (*see* dissenting op at 25-26). We decline, however, to adopt the dissent's ill-defined stranger/non-stranger dichotomy to determine when a court is permitted to exercise its discretion (*see* dissenting op at 1-2, 25-26 & n 9; *but see* 26 [setting forth a "brief encounter" exception to the "stranger" rule]). Moreover, the dissent's statement that a witness should not be permitted to identify a perpetrator for the first time in court when their identification is "solely based on the memory of a crime" is confusing, as it is either seemingly redundant to the "stranger" rule, or implies that a witness should base their in-court identification on something other than their memory of the crime (*see* majority op at 1-2, 23, 28; *but see* 25 n 9 ["The source of the witness's trial testimony is . . . what they observed during the course of the crime"]). Such a rule finds no support in our law.

to seek protective measures that would bolster or draw further attention to the identification. A rule requiring courts to order that identification procedures be employed regardless of a defendant's preference (*see* dissenting op at 22-23) would hinder defense attorneys' ability to choose a strategy in their clients' best interest and inappropriately circumvent the trial judge's role of evaluating the demands of the particular case.

In the absence of the guidance we provide today, the People did not specifically notify the defendant that the witness might be called to identify him. Nonetheless, the body-camera footage and the 911 call—together with the People's witness list, which included this witness—alerted defendant that the witness would likely make a first-time, in court identification. Defendant did not request any alternative identification procedures before the witness testified but sought preclusion of the identification during her testimony.

## III.

Trial courts may "exclude relevant evidence if its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues[,] or misleading the jury" (*People v Primo*, 96 NY2d 351, 355 [2001]). The admissibility of a first-time, in-court identification is therefore vested to the discretion of the trial court.

In exercising this discretion in the context of a first-time, in-court identification, the court must consider the danger of misidentification from the suggestiveness of a first-time, in-court identification, and whether there are independent assurances of the identification's reliability that outweigh this risk. Such considerations may include: the witness's familiarity with the defendant, the quality of the witness's opportunity to observe the defendant before the incident in question (*see Marshall*, 26 NY3d at 509; *People v Ramos*,

42 NY2d 834 [1977]), the witness's ability to provide accurate descriptive details regarding the defendant (*see Brisco*, 99 NY2d at 597), the time between the crime and the testimony, and whether there is other, reliable trial evidence corroborating the identification (*see People v Allen*, 13 NY3d 251, 269 [2009]). In evaluating the danger of misidentification, the court may also take into account the suggestiveness of the in-court identification procedure itself.

When a defendant is not given advance notice of the identification, the trial court may also consider whether there was any reason for the failure to provide notice and the extent to which it has prejudiced the defendant. In general, to limit the risk that a trial court will exclude an identification for lack of notice, the People should provide explicit notice at the earliest possible juncture. Going forward, application of this framework should render attempts to elicit unnoticed, first-time, in-court identifications uncommon, and the admission of such identifications even less so. We acknowledge, though, that situations may arise where the People, through no fault of their own, are not themselves aware of a witness's ability or willingness to make an identification during their trial testimony. Trial courts must assess how to proceed in such scenarios on a case-by-case basis.

During her trial testimony, the witness established her ability to observe the shooting and view the shooter. She described the shooter in detail, establishing that she had a sufficient opportunity to view the shooter in order to make a reliable identification. And her trial testimony, which took place only five months after the shooting, mirrored her previous description of the shooter on the 911 call. Moreover, the witness's identification was far from the only evidence linking defendant to this crime. The victim, who had met

defendant prior to the shooting, also identified defendant as the shooter and confirmed that he and defendant appeared on the surveillance video. Indeed, defendant can be seen on the video not only wearing the precise clothing that the witness had described, but also holding what is clearly a gun. The police investigator, for his part, testified that defendant was stopped driving the same vehicle in which the shooter can be seen fleeing the scene. Though the People were not aware of any duty to provide notice, this does not appear to have significantly prejudiced the defendant, given that he was provided with the witness's unequivocal statements that she could identify the perpetrator. Here, Supreme Court therefore did not abuse its discretion as a matter of law in denying defendant's request to preclude the witness's first-time, in-court identification.

In any event, any error was clearly harmless (*see People v Harris*, 80 NY2d 796, 798 [1992]; *People v Owens*, 74 NY2d 677, 678 [1989]; *People v Oliver*, 34 NY2d 859, 860 [1974]).

IV.

This Court is unanimous in its resolve to curtail the dangers of first-time, in-court identifications. Our approach ensures that defendants have notice and an opportunity to be heard and empowers trial courts to ensure the reliability of such identifications before they are elicited at trial. Beyond that, trial courts are well equipped to assess the admissibility of first-time, in-court identifications and exclude those that pose a risk of misidentification or other undue prejudice.

Defendant's remaining contention lacks merit.

Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (dissenting):

A first-time, in court identification by a person unfamiliar with the defendant is highly suggestive and can lead to a wrongful conviction. I would adopt a rule requiring the prosecution to conduct a pre-trial procedure that accords with due process and ensures a defendant's right to a fair trial when: 1) identification is at issue; 2) the witness is a stranger

to the defendant; and 3) the witness's memory of the crime is the only basis for the identification. Absent such a procedure, an in-court identification should be prohibited. This rule places the burden of demonstrating the identification's reliability on the prosecution—the party that bears the burden of establishing defendant's guilt beyond a reasonable doubt, the party that can wield the power of the State to ensure the administration of a constitutionally-adequate procedure, and the party best positioned to proffer evidence that the identification is reliable and not a product of unlawfully suggestive practices or cues. The rule would effectuate the truth-seeking function of the trial by testing this most unreliable form of testimonial evidence against the accused—eyewitness identification by a stranger based on observations made under stressful conditions—before deciding whether the testimony should be presented to the jury. The rule also incentivizes pre-trial identification procedures consistent with well-established constitutional mandates and disincentivizes mid-trial requests for untested, inherently suggestive testimony.

In contrast, the majority's rule shifts the burden onto the defendant and rewards State actors for failing to conduct a constitutionally-valid, out-of-court identification before the witness takes the stand. Worse, the majority's approach sanctions what is nothing more than an in-court "show up" identification, without the constitutional protections against this inherently unreliable practice. Finally, while acknowledging the risks of misidentification attendant to first-time, in-court identifications, the majority concludes

that admission of the testimony against defendant was harmless. But harmless error analysis has no place when, as here, defendant is denied a fair trial.

We can and must do better to protect the integrity of the criminal legal system and to protect defendants by avoiding the risk of convictions of the innocent based on misidentifications. I dissent.

## I.

Defendant Thomas Perdue claims that his due process rights were violated by an unduly suggestive first-time, in-court identification by a person unfamiliar with him. Science supports defendant's claims that this type of identification is inherently unreliable.

## A.

### Wrongful Convictions Based on Misidentification

Wrongful convictions based on misidentification are a real phenomenon. "Inaccurate identifications, especially misidentifications by a single eyewitness, play a role in the vast majority of post-conviction DNA-based exonerations in the United States" (*People v Boone*, 30 NY3d 521, 535 [2017]). The National Academy of Sciences has concluded that "at least one mistaken eyewitness identification was present in almost three-quarters of DNA exonerations" and another report has put the number around 70% (*id.*, citing Identifying the Culprit: Assessing Eyewitness Identification 11 [2014]; Innocence Project, DNA Exonerations in the United States [2023], available at

https://innocenceproject.org/dna-exonerations-in-the-united-states/ [last accessed Dec. 3, 2023]).

In New York, there are growing numbers of exonerations (*see* Hurubie Meko, *City to Pay Record $17.5 Million Settlement After Wrongful Conviction*, NY Times [Nov. 16, 2023]). In 2022, New York City alone "settled cases involving 16 wrongful convictions, the most of any single year" (*id*.) Out of the 354 exonerations in New York State since 1989, 122 involved a mistaken eyewitness identification (Interactive Map: Exonerations by State, National Registry of Exonerations, Univ of Michigan [Sept. 27, 2023], available at https://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx [last accessed Dec. 3, 2023]). In one particularly egregious example from 2004, Sheldon Thomas was convicted in Kings County of killing a 14-year-old boy and sentenced to 25 years in prison (*Thomas v New York Dept. of Corr*., 2017 WL 5891778 [ED NY 2017]). His arrest was based, in part, on an eyewitness who identified him in a photo array that police assembled using what they believed to be his photo. There was just one problem: they used the photograph of a different man named Sheldon Thomas. During pre-trial hearings, a detective admitted that "he had 'mixed up' the details of the photographic array" (*id*. at *2). Nevertheless, the suppression court concluded the error was "of no legal consequence" because the other Sheldon Thomas "resembled [the defendant], had the same name, and police believed in 'good faith' that the person in the

photograph was [the defendant]" (*id*. at *4). Earlier this year, Thomas was exonerated following an investigation by the Brooklyn District Attorney's Conviction Review Unit.[1]

In another salient example, the Manhattan District Attorney moved in 2016 to vacate the conviction of Clifford Jones after he served 29 years in prison for rape and murder—making him one of the longest-incarcerated individuals to be wrongfully convicted in New York State (Longest Incarcerations, National Registry of Exonerations, University of Michigan, available at https://www.law.umich.edu/special/exoneration/Pages/longestincarceration.aspx [last accessed Dec. 3, 2023]). "At trial, the only witness who was able to identify him as the perpetrator of the crime was the rape victim," who claimed that she had entered an apartment building with the perpetrator intending to have sex with him, but after she had second thoughts, the man "put a knife to her throat and raped her" (*People v Jones*, 24 NY3d 623, 631 [2014]). The perpetrator then encountered another man in the stairway, and the rape victim watched as the two "tussl[ed]" and the perpetrator stabbed the man with the knife (*id*.). Months later, she identified Jones as the perpetrator in a photo array and in a subsequent lineup (*id*.). However, she testified at trial that she was a daily heroin user and "had taken heroin on the morning of the lineup" (*id*.). Years after Jones' convictions were upheld on appeal (91 AD2d 874 [1st Dept 1982]), DNA testing of hair

---

[1] District Attorney's Offices in the following New York State counties maintain wrongful conviction units whose work has led to several exonerations: Bronx (8 exonerations), Erie (1), Kings (39), Nassau (2), New York (12), Putnam (1), Queens (12), Richmond (1), and Suffolk (3) (*see* Conviction Integrity Units, National Registry of Exonerations [Nov. 7, 2023], available at https://www.law.umich.edu/special/exoneration/Pages/Conviction-Integrity-Units.aspx [last accessed Dec. 4, 2023]). The following counties also have conviction integrity units: Monroe, Oneida, Orange, Ulster, and Westchester.

recovered from a baseball cap left at the scene and fingernail scrapings from the murder victim excluded Jones as the perpetrator (Longest Incarcerations, National Registry of Exonerations).[2]

Mistaken identifications are caused, in large part, by the natural distortion of memory that "occur[s] simply with the passage of time and with repeated recounting of events" (Joyce W. Lacy & Craig E.L. Stark, *The Neuroscience of Memory: Implications for the Courtroom*, 14 Nat Rev Neuroscience 9, 649-658 [2013]). However, our memories are also easily misled. The " 'misinformation effect' . . . refers to a distortion in an original memory after being exposed to misleading information," which "can be as subtle as slight variations in the wording of a question" or "nonverbal feedback via body language and facial expressions" by an officer conducting a lineup (*id*., citing Lynn Garrioch & C.A. Elizabeth Brimacombe, *Lineup Administrators' Expectations: Their Impact on Eyewitness Confidence*, 25 Law & Hum Behavior 299-315 [2001]). It is therefore no surprise that up to 80% of misidentification cases involve suggestive police practices (Alexis

---

[2] Other individuals exonerated in New York after decades in prison include Mark Denny (witness had been blindfolded for part of the attack and consistently said she was attacked by three men, but changed the number to four after police made Denny a suspect); Felipe Rodriguez (several witnesses viewed lineup and only one witness, who had been using drugs and alcohol on the night of the crime, selected Rodriguez, who did not fit the witness's initial description); Valentino Dixon (three witnesses identified Dixon in a photo array, although each of their descriptions were more consistent with a different suspect); and Emmanuelle Cooper (witnesses failed to make an identification in several photo arrays, and one witnesses selected Cooper in a photo array but subsequently did not identify him in a lineup) (*see* Longest Incarcerations, National Registry of Exonerations, University of Michigan, available at https://www.law.umich.edu/special/exoneration/Pages/longestincarceration.aspx [last accessed Dec. 3, 2023]).

Agathocleous, *How Eyewitness Misidentification Can Send Innocent People to Prison*, Innocence Project [April 15, 2020], available at https://innocenceproject.org/how-eyewitness-misidentification-can-send-innocent-people-to-prison/ [last accessed Dec. 1, 2023]).

Many other "powerful variables [can] affect the reliability of eyewitness identification evidence," such as "cross-race identifications, stress during the witnessing of a crime, quality of view," etc. (Gary L. Wells, et al., *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 L & Hum Behavior 1, 3-36 [2020]).[3] Cross-racial bias is a "memory phenomenon" in which the accuracy of an identification is reduced when identifying "faces of a race or ethnic background different from one's own" (Lacy & Stark, *The Neuroscience of Memory*, 14 Nat Rev Neuroscience 9). Studies have shown that "we use our entire existing body of knowledge and experiences" in reconstructing memories, and people are "most familiar" with the "facial features of [their] own race" (*id*.). We have recognized this "near consensus in the relevant scientific community" and required in *Boone* that where an identifying witness and the defendant "appear to be of different races," the trial court must "give, upon request, during final instructions, a jury charge on the cross-race effect," instructing the jury to consider that "some people have greater difficulty in

---

[3] Based on recent field studies collecting data from 6,734 lineups, among the witnesses who made an identification, over one third identified an innocent filler (Wells, *Policy and Procedure Recommendations*, 44 L & Hum Behavior at 5).

accurately identifying members of a different race" and to consider whether the racial difference may have affected the identification at issue (30 NY3d at 535).

Despite these thoroughly studied problems with witness memory, juries are unaware of the research and tend to have "nearly religious faith in the accuracy of eyewitness accounts" (Jules Epstein, *The Great Engine That Couldn't: Science, Mistaken Identifications, and the Limits of Cross-Examination*, 36 Stetson L Rev 727, 772 [Spring 2007], quoting Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* [3d ed 1997]). As Justice Brennan recognized, "there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" (*Watkins v Sowders*, 449 US 341, 352 [1981] [Brennan, J., dissenting], quoting Loftus & Doyle, *Eyewitness Testimony* at 19). Juries tend to trust a witness even more when the witness expresses confidence, yet research has "shown weak or even negative correlations between a person's confidence in the accuracy of a memory and the actual accuracy of that memory" (Lacy & Stark, *The Neuroscience of Memory*, 14 Nat Rev Neuroscience 9). In other words, "[a]ccuracy often produces confidence, but confidence does not necessarily indicate accuracy" (*id.*). This is the case even when the witness is the victim (Epstein, *The Great Engine That Couldn't*, 36 Stetson L Rev at 731, 745-746 ["studies have mirrored the experience of victimization, most significantly in the area of stress" and have concluded that high-stress situations produce lower accurate identification rates than low-stress situations"]; *see also* early scholar Edwin M. Borchard, *Convicting the Innocent*, 367 [1932] [jurors are predisposed "to credit the veracity and

reliability of the victims of an outrage (more) than any amount of contrary evidence" but "the emotional balance" of the victim may be disturbed by the experience and their perception "distorted"]). Compounding the problem, witnesses tend to grow more confident over time. One study found that out of 190 DNA exonerations involving a misidentification, 40% involved a witness who did not initially identify the innocent suspect but by the time of trial were completely certain of their identification (Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 68 [2011]).

The Court has repeatedly acknowledged the danger to defendants presented by mistaken eyewitnesses (*see e.g. People v Marshall*, 26 NY3d 495, 502 [2015], citing *United States v Wade*, 388 US 218, 288 [1967]; *People v Santiago*, 17 NY3d 661, 669 [2011]; *People v Riley*, 70 NY2d 523, 531 [1987]; *People v Caserta*, 19 NY2d 18, 21 [1966]). To assist the jury with evaluating and weighing this testimony, the Court has said that "courts are encouraged" to grant "expert testimony on the subject of eyewitness recognition memory [to] educate a jury concerning the circumstances in which an eyewitness is more likely to make such mistakes" (*Santiago*, 17 NY3d at 669 [hearing court abused its discretion by denying expert testimony where "the case turned on the accuracy of a single eyewitness identification and there was no corroborating evidence connecting the defendant to the crime"], citing *People v Drake* (7 NY3d 28, 31 [2006]; *see also People v LeGrand* (8 NY3d 449 [2007]; *People v Abney* (13 NY3d 251 [2009]). "It is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their

knowledge, and when they would be benefited by the specialized knowledge of an expert witness" (*People v Lee*, 96 NY2d 157, 162 [2001], citing *People v Cronin*, 60 NY2d 430, 433 [1983]). But while jurors "may be familiar from their own experience with factors relevant to the reliability of eyewitness observation and identification, it cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror" (*id.*).

Despite our statements extolling the potential value of such expert testimony, courts—like some lawyers—often do not fully appreciate how expert testimony may assist the jury. The testimony is considered unnecessary because the factors that impact on the reliability of an identification are believed to be "within the ken of the typical juror" (*id.*), even when the science shows otherwise. Not only are jurors unaware of the most significant factors that negatively impact on witness memory and thus the accuracy of an identification, but some jurors may consider negative factors as actually weighing in favor of the reliability of the identification. For example, jurors may mistakenly believe that the presence of a weapon causes the witness to pay more attention and observe the perpetrator more carefully, but according to scientific research "eyewitnesses observing a crime in which a perpetrator carries a weapon are *less* accurate in describing or identifying the suspect in a lineup compared to crimes with no weapons involved," likely due to the "stress and arousal" caused by "the perceived threat induced by a weapon" (Kerstin Kocab & Siegfried L. Sporer, *The Weapon Focus Effect for Person Identifications and Descriptions: A Meta-Analysis*, Advances in Psych & L 71-117 [June 2016] [emphasis added]). Without

knowledge of this phenomenon, jurors may mistakenly "believe that the presence of a weapon increases attention overall and enhances eyewitness reliability" (Epstein, *The Great Engine That Couldn't*, 36 Stetson L Rev at 777).

B.

Human Impact of Wrongful Convictions

It takes years to overturn a wrongful conviction, and during those years the innocent remain locked away in prison while the actual perpetrators remain unidentified. According to one report, out of 375 documented DNA exonerations, the average exoneree spent 14 years in prison, and 10% spent 25 years or more behind bars (Research Resources, Innocence Project [2023], available at https://innocenceproject.org/research-resources/ [last accessed Dec. 3, 2023]). As we have recognized, the effect is corrosive: "[w]rongful convictions based on mistaken eyewitness identifications pose a serious danger to defendants and the integrity of our justice system" (*Marshall*, 26 NY3d at 502). Every exoneration reminds the public that the system failed. And the longer it takes to correct a miscarriage of justice, the greater the public's  disillusionment with our professed commitment to justice (*see* Jordan Nowotny et al., *Understanding Public Views of Wrongful Conviction Frequency and Government Responsibility for Compensation: Results From a National Sample*, 34 Crim Just Pol Rev 2, 155 [2022] [in a national sample, most participants believed that "wrongful convictions are relatively common" and there was "near unanimous support for government compensation" to wrongfully convicted individuals]; Robert J. Norris & Kevin J. Mullinix, *Framing Innocence: An Experimental*

*Test of the Effects of Wrongful Convictions on Public Opinion*, 16 J Experimental Crim 2, 311-332 [2020] [the "presentation of factual numbers of exonerations reduces support for capital punishment and erodes trust in the justice system" but does not increase support for police reforms or personal concern about wrongful convictions, while narratives about individual wrongful convictions "ha(ve) more pronounced effects on death penalty attitudes" and "increase( ) personal concern and support for police reform"]).

Wrongful convictions also destroy the lives of the innocent and their families. The human toll is unquantifiable; years taken can never be recovered. Mark Denny, who was exonerated in 2017, spent nearly 30 years in prison for a rape and robbery in Brooklyn after he was misidentified by the rape victim (Michelle Kim, *Man Freed in Wrongful Rape, Robbery Conviction of 1987 Burger King Case*, NBC 4 New York, available at https://www.nbcnewyork.com/news/local/prisoner-exoneration-wrongful-conviction-burger-king-rape-robbery-brooklyn/378461/ [last accessed Dec. 3, 2023]). Denny, who wanted to be a police officer when he was a child, said his decades in prison were "torturous" and he contemplated suicide (*id*.). His family suffered greatly too. Denny's mother "lost her house in Brooklyn while trying to finance lawyers to get him out of prison" (*id*.). According to Denny, his mother's homelessness "destroyed" him (*id*.). District Attorney Eric Gonzalez recognized that the terrible error in this case "happened because little was known back then about memory retention and retrieval, and their effect on eyewitness identification" (*id*.). The District Attorney sought assistance from an expert on eyewitness identifications who opined that the victim's limited chance to see her attackers,

the extreme stress of the rape, and the long delay between the attack and the identifications "could have contributed to false identification" (*id.*).

Research also shows that, although "public opinion surveys have found people to be generally supportive of wrongfully convicted persons," individuals still report being stigmatized in their communities (Kimberley A. Clow & Amy-May Leach, *After Innocence: Perceptions of Individuals Who Have Been Wrongfully Convicted*, 20 Legal & Crim Psych 147, 148 [2015]). Members of their community may not know or may not believe that they were wrongfully convicted or, even if they are aware of the person's innocence, may believe that the person was "associating with criminals while incarcerated" or is really a "prior criminal[]" despite being wrongfully convicted of one crime (*id.* at 148-149). And, of course, someone who has "lost years in prison" may have "difficulties in attaining housing and employment post-incarceration" and may face the "contemptuous prejudice" associated with being "low in status" (*id.* at 149-150).

## II.

### First-Time, In-Court Identifications

#### A.

##### Inherent Suggestiveness

First-time, in-court identifications are inherently suggestive. As the United States Supreme Court has recognized, "[m]ost eyewitness identifications involve some element

of suggestion" but "*all* in-court identifications do" (*Perry v New Hampshire*, 565 US 228, 244 [2012] [emphasis added]). The majority posits that the inherent suggestiveness of an in-court identification lies in the fact that the defendant is seated at the defense table, and "the traditional courtroom seating arrangement may itself suggest to the witness who should be identified" as the perpetrator of the crime (majority op at 6). Other courts have recognized the same (*see United States v Archibald*, 734 F2d 938, 941 [2d Cir 1984] [noting that "[a]ny witness, especially one who has watched trials on television, can determine which of the individuals in the courtroom is the defendant, which is the defense lawyer, and which is the prosecutor]; *United States v Morgan*, 248 F Supp 3d 208, 213 [D DC 2017] [endorsing *Archibald*'s rationale and recognizing that in the case at bar there would "be no doubt that the African-American man seated at counsel table is being prosecuted for crimes"]).

But that is not the only basis for the heightened suggestiveness of first-time in-court identifications. Courts and legal scholars have identified the witness's observation of and participation in the proceeding itself as adding to the suggestiveness. The witness knows that the State has investigated the crime and concluded that the defendant is guilty beyond a reasonable doubt, pressuring the witness to confirm the correctness of the State's prosecution (*see State v Dickson*, 322 Conn 410, 439-440, 141 A3d 810, 832 [2016] [noting that, "when the state places the witness under the glare of scrutiny in the courtroom and informs the witness of the identity of the person who has been charged with committing the crime, it is far less likely that the witness will be hesitant or uncertain when asked if

that person is the perpetrator"]).[4] This "social environment . . . produces an immensely strong commitment effect" (Brief of Amici, *Garner v Colorado*, 2019 WL 3854682 at *14 [2019]). The witness "may feel that failing to identify the defendant 'will make [the witness] appear incompetent, unreliable, or unhelpful to law enforcement'" (*id.*).

Additionally, the effect of implicit bias undoubtedly exacerbates the inherent suggestiveness of in-court, cross-racial identifications (see Report, *Equal Justice in the New York State Courts: 2022 Year in Review*, New York State Unified Court System [2022] available at www.nycourts.gov/LegacyPDFS/publications/22-Equal-Justice-Review.pdf [last accessed Dec. 9, 2023]; Sonia Moghe, *Report Reveals 'Long-Simmering Racial Tensions' in New York State Courts*, CNN [Oct. 16, 2020], available at https://www.cnn.com/2020/10/16/us/new-york-state-courts-racial-tensions/index.html [last accessed Dec. 9, 2023] [discussing Jeh Johnson's 2020 Special Adviser Report on Equal Justice, which uncovered systemic bias in the State court system and recommended mandatory bias training for judges and non-judicial staff]). And bias pervades the system. People of color are more likely to be prosecuted than White people, both because their communities are disproportionately policed and because ingrained racial bias may impact charging decisions leading to higher prosecution rates for Black individuals (*see* Report,

---

[4] That is why an officer conducting a pre-trial identification procedure is discouraged from informing the witness that a suspect is already in custody. "Courts around the country recognize the inherent danger of an identification procedure in which the witness is aware of whom police officers have targeted as a suspect" (Aliza B. Kaplan & Janis C. Puracal, *Who Could it Be Now? Challenging the Reliability of First Time In-Court Identifications After State v. Henderson and State v. Lawson*, 105 J Crim L & Criminology 4, 983 [2015]).

Tracking Enforcement Trends in New York City: 2003-2018, Data Collaborative for Justice [Sept. 2020]; Report, Race and Prosecution in Manhattan, Vera Institute of Justice [July 2014]; Alan Feuer, *Black New Yorkers Are Twice as Likely to Be Stopped by the Police, Data Shows*, NY Times [Oct. 10, 2021], available at https://www.nytimes.com/2020/09/23/nyregion/nypd-arrests-race.html [last accessed Dec. 9, 2023]; Timothy Williams, *Black People Are Charged at a Higher Rate Than Whites. What if Prosecutors Didn't Know Their Race?*, NY Times [June 12, 2019], available at https://www.nytimes.com/2019/06/12/us/prosecutor-race-blind-charging.html [last accessed Dec. 8, 2023]). Black individuals are also more likely to be wrongfully convicted. While less than 14% of the American population is Black, Black defendants account for over half of all exonerations and are seven times more likely to be wrongfully convicted of murder than White defendants (*Race and Wrongful Convictions in the United States 2022*, National Registry of Exonerations [Sept. 2022]). In the context of a first-time, in-court identification, some element of suggestiveness inheres when the defendant's race or ethnicity matches the race or ethnicity that the witness has used to describe the perpetrator. Unsurprisingly, that suggestiveness is heightened when the defendant is the only person of color in the courtroom—or one of very few.

Courts have also recognized that asking a witness for the first time on the stand whether the person they observed commit a crime is present in the courtroom, and if so to identify them, is essentially a single-person, show-up identification without the constitutional guardrails imposed on pre-trial photo arrays and line-ups (*see e.g. State v*

*Watson*, 254 NJ 558, 579 [2023] ["Showups can serve a valuable purpose if conducted within hours of a crime," but an "in-court identification is essentially a live, single-person line-up . . . comparable to a showup but [] conducted well after the crime has taken place"]). An in-court identification may be more suggestive than a show-up because "within hours of a crime, the eyewitness . . . is unlikely to know how confident the police are in their suspicion (of the individual)" but "in the court room, the eyewitness knows that the defendant has been charged" (*Commonwealth v Crayton*, 470 Mass 228, 237, 21 NE3d 157, 166 [2014]). As these courts have concluded, there is no logical basis for treating pre-trial identifications with greater caution than in court identifications when the latter is so highly suggestive (*see Dickson*, 322 Conn at 423-424 ["(W)e are hard-pressed to imagine how there could be a *more* suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime"]). Indeed, treating in court identifications differently discourages the use of pretrial identification procedures, thereby creating a path for the State to avoid the constitutional mandates, internal rules, and best practices developed over time to minimize the suggestiveness of those procedures (*see e.g. People v Hawkins*, 55 NY2d 474 [1982] [once the right to counsel has attached, defense counsel must receive notice of any lineup and is entitled to attend]; *People v Chipp*, 75 NY2d 327, 336 [1990] [a photo array should show other individuals sufficiently similar in appearance to the suspect such that the suspect is unlikely to be "singled out for identification based on particular characteristics"];

*see also* New York State Lineup Procedure Guidelines, New York State District Attorneys Association Best Practices Committee [Nov 2010]).[5]

As with unduly suggestive out-of-court procedures, reliance on first-time, in-court identifications violates a defendant's due process rights and "adversely impact[s] the truth-finding process" (*see Marshall*, 26 NY3d at 503). It is thus incumbent upon the judiciary to develop and enforce rules that incentivize the use of constitutionally-sound pre-trial practices and State officials to heed those commands in order to reduce the risk of misidentification-based wrongful convictions.

### B.

### The Majority Rule Falls Short

1. Presumption of Suggestiveness and the Prosecution's Burden

The majority elides the reality that wrongful convictions occur in New York, referring in the abstract to the "danger of wrongful convictions presented by mistaken identification[s]" and alluding by citation to the steps the Court has taken to protect defendants "from such miscarriages of justice" (majority op at 4, citing *Boone*, 30 NY3d at 521; *Marshall*, 26 NY3d at 495; *Santiago*, 17 NY3d at 669 [2011]; *Riley*, 70 NY2d at

---

[5] The Lineup Procedure Guidelines instruct administrators to, among many other things: refrain from informing the witness if an arrest has been made; use at least five "fillers" who are unknown to the witness and similar to the suspect in appearance; allow the suspect to choose their own position in the lineup and, if a photo array was previously conducted, to avoid having the suspect in the same numerical position they appeared in the array; give all instructions before the procedure begins and refrain from making any further comments until the procedure is finished; document every aspect of the procedure, including the exact words of the witness; and honor any reasonable requests from defense counsel.

530-531). On that foundation, the majority adopts an inadequate notice rule that burdens the defendant with mitigating the errors of the prosecution and the police.

The majority first fails to adopt a clear standard for the provision of notice in accordance with general due process principles (*Sessions v Dimaya*, 584 US—, 138 S Ct 1204, 1225 [2018] [Gorsuch, J., concurring] ["Perhaps the most basic of due process customary protections is the demand of fair notice"], citing *Connally v General Constr. Co.,* 269 US 385, 391 [1926]; Note, *Textualism as Fair Notice*, 123 Harvard L Rev 542, 543 [2009] ["From the inception of Western culture, fair notice has been recognized as an essential element of the rule of law"]). According to the majority, the prosecution need only "ensure that the defendant is aware of th[e] possibility" "that the witness may make a first-time, in-court identification" (majority op at 7). But to avoid mistaken assumptions about a defendant's awareness and appellate challenges on the issue, the prosecutor should directly inform the defendant of this potential identification. Why hide the ball? Why rely on some version of constructive notice and the attendant judicial interpretation of what is adequate under the circumstances? We should be particularly suspect of anything less than clear, express on-the-record notice, given that the defendant's liberty is at stake.[6] And if the prosecutor did not know for certain until trial that they would ask for an in-court

---

[6] Express record notice can be written or oral, depending on the circumstances of the particular case.

identification, that would not preclude the prosecutor from notifying defendant, as the majority says, of that "possibility" (majority op at 7).

The majority next goes astray by imposing on defendants in the first instance the burden to contest the propriety of the in-court identification, even though it is the State's pre-trial inaction that has led it to request an inherently suggestive identification during trial. Under the majority's rule, once a defendant is made aware that the prosecution intends to call a witness who might make a first-time identification at trial, it is up to the defendant to persuade the trial court that an alternative procedure is necessary to avoid the inherent suggestiveness of the in-court identification (*see* majority op at 7-8). But science supports a presumption that the in-court identification is inadmissible unless preceded by a court-approved, nonsuggestive pre-testimony procedure. Those procedures can be conducted when practicable before the testimony, for example, by a photo array or lineup that is not unduly suggestive. The majority's rule not only burdens the party who did not create the problem in the first place, but also fails to encourage prosecutors to conduct pre-testimony identification procedures in a manner that avoids the heightened suggestiveness of in court identifications, even when they could do so easily.

In addition to misallocating the burden onto the defendant, the majority's rule allows for violations of defendants' rights to due process and a fair trial. The majority vests trial courts with discretion to determine whether to order a nonsuggestive identification procedure (majority op at 6-7). But a first-time, in-court identification is simply a "show-up," and the law should regard it as such. Put another way, just as an identification based

on a suggestive pre-trial procedure should not be admitted at trial, neither should a court

discretionarily admit an identification made under the more suggestive conditions of the

courtroom. The latter scenario is the epitome of unfairness.[7]

### 2. Cross Examination Does Not Mitigate In-Court Suggestiveness

The majority implies that its rule benefits the defendant because it allows the

defense to strategically choose the in-court identification, subject to cross-examination,

over a pre-testimony procedure (majority op at 8). The majority thus concludes that defense

counsel's opportunity to cross-examine a witness on the reliability of their in-court

identification provides an opportunity to mitigate its suggestiveness. But "the reliance of

courts on the power of cross-examination" in this context "has no support in the literature"

(Epstein, *The Great Engine That Couldn't*, 36 Stetson L Rev at 727, 774). Cross-

examination is a poor means to mitigate suggestiveness when the witness testifies truthfully

about what they sincerely believe they observed. Put another way, cross-examination may

be an effective tool to ferret out the liars but it is a woefully ineffective device for probing

---

[7] The majority asserts that its rule "should render attempts to elicit unnoticed, first-time, in-court identifications uncommon, and the admission of such identifications even less so" but then makes obvious to the reader that admission is not error (majority op at 9). The majority fails to explain why the prosecution's uncertainty about the witness's identification should preclude a pre-testimony procedure. If we really want to decrease the risk of wrongful convictions based on misidentifications, then these in-court identifications by strangers, under the circumstances I have discussed, should be tested before the witness takes the stand. Even if the majority is correct that under its rule these types of identifications will be "uncommon," the majority rule still permits some number of defendants to be prosecuted under circumstances that all members of this Court agree are highly suggestive.  The rule thus violates established notions of due process and fairness.

a witness who genuinely believes in the truth of their testimony and the accuracy of their identification (*id.* at 766).

Studies show that defense counsel "start[s] at a disadvantage" due to jurors' tendency to believe eyewitness accounts (*id*. at 772, quoting Elizabeth F. Loftus & James M. Doyle, Eyewitness Testimony: Civil and Criminal [3d ed 1997]). A witness testifying sincerely but inaccurately "will not display the demeanor of [a] dishonest or biased witness" (*id*.). Further, "[t]he likelihood that a committed eyewitness will recant [their] position (or fall apart on the stand) is so minimal that it is hardly worth considering" (*id*. at 771, quoting Brian L. Cutler, *Eyewitness Testimony: Challenging Your Opponent's Witness*, at 97 [Natl Inst Trial Advocacy 2002]). There are no *Perry Mason* moments. As a result, seasoned practitioners warn new attorneys to "have minimal expectations for cross-examination in eyewitness-identification cases" and not to expect a "knock-out punch" (*id*. at 772, citing Loftus & Doyle, *Eyewitness Testimony*). Instead, they should simply aim "to hold the risks to an absolute minimum" (*id*.).[8] These practitioner guides and instructions illustrate the inadequacy of cross-examination as a means to mitigate the suggestiveness of an in-court identification.

The majority concedes that cross-examination and counsel's arguments to the jury "do[ ] not render an in-court identification less suggestive and do[ ] not always eliminate

---

[8] Epstein agrees that cross-examiners of eyewitnesses face a steep uphill battle, but suggests that a "skilled cross-examiner can always make some headway with an eyewitness" if they can "establish inconsistencies or a reduced opportunity to observe" (Epstein, *The Great Engine That Couldn't*, 36 Stetson L Rev at 781).

the risk that a jury may credit a tainted identification" (majority op at 6). Nonetheless, the majority claims that counsel may rely on cross-examination as part of its defense strategy (*id*. at 6, 8). That "choice" is no choice at all because no amount of cross-examination can undo the damage wrought by the jury's exposure to a highly suggestive and unreliable method of identification that both the law and experts have told us increases the risk of a misidentification and a possible wrongful conviction (*see* section II.A, supra). A defense attorney's strategy to avoid the pre-testimony identification is of course understandable, but the research demonstrates it is a strategy based on assumptions and traditions ill-suited to the specific task of undermining a mistaken but confident witness (*see* Loftus & Doyle, *Eyewitness Testimony: Civil and Criminal*; Cutler, *Eyewitness Testimony: Challenging Your Opponent's Witness* at 97)  That strategy is akin to throwing a drowning person a lifesaver attached to an anchor.

Perversely, the majority's rule advantages the State, rewarding its failure to conduct a pre-trial or pre-testimony procedure. The real choice should be between a mandatory pre-testimony nonsuggestive procedure or exclusion of the identification testimony. Requiring the prosecution to subject the witness to a constitutionally-adequate procedure mid-trial does not impair the defendant's rights because the defendant could not have prevented such a procedure before trial. And if an out-of-court procedure is conducted mid-trial, the right to counsel has attached and defense counsel is entitled to be present (*see Hawkins*, 55 NY2d 474). In other words, neither party is worse off under a rule requiring a pre-testimony procedure as a condition to admission of the in-court identification than if the State had initially conducted the procedure before trial and provided CPL 710.30 notice to the

defense. And if the witness cannot identify the defendant before trial, they should not be allowed a second opportunity, in the crucible of a suggestive courtroom setting, to identify the defendant.


                                            C.


One simple way to reduce the chance that someone will go to jail for a crime they did not commit is to prohibit highly suggestive first-time, in court identifications by a witness unfamiliar with a defendant like the identification at issue in this appeal. First-time, in-court identifications create the "ultimate 'targeted suspect' situation that courts have repeatedly condemned in the pretrial context" (Aliza B. Kaplan & Janis C. Puracal, *Who Could it Be Now? Challenging the Reliability of First Time In-Court Identifications After State v. Henderson and State v. Lawson*, 105 J Crim L & Criminology 4, 984 [2015]). The "expectancy effect," which psychologists use to refer to the unconscious influence that lineup administrators may have on a witness, may be mitigated by "double-blind" procedures in which the administrator is not an investigator of that particular case "and does not know who the suspect is" (*id*. at 984-985). But "there is no chance" for such a procedure in a first-time, in-court identification (*id*. at 985). Everyone in the courtroom is "aware that the suspect is the individual seated at the defense table." (*id*.). There is simply

no way to insulate the witness from this powerful influence except to prohibit first-time, in-court identifications.

Fundamental fairness and due process requires that, when there has been no pre-trial identification, the prosecution must move for permission to elicit a first-time in-court dentification. Unlike the majority's rule, my rule provides the court and defendant with clear notice of the prosecution's intent, leaving no doubt or appellate issue as to defendant's awareness of the possibility of a first-time, in-court identification (*see* majority op at 7-8). Where either identification is not at issue in the case, the witness is familiar with the defendant prior to the crime, or the identification is not based solely on the witness's memory of observing the crime, the court may grant the motion.[9] In all other cases, the court should order a pre-testimony identification procedure, after considering alternatives recommended by the prosecution and defendant. Where no such procedure is conducted, the motion must be denied.

---

[9] The majority asserts that there is some vagueness in the rule that I here describe as most aligned with our law and best designed to protect the defendant's rights (majority op at 7 n 2). But there is nothing vague in a rule that distinguishes between witnesses who are strangers to the defendant and those who know a defendant well enough to reliably identify them. The potential unreliability of an identification by a person who observed the perpetrator for the first time at the moment of the crime, compared to the certainty of an identification by, for example, the spouse of the perpetrator is plain. Under my rule, and that of other jurisdictions, a witness who does not know the defendant can be asked to identify the defendant in court once the reliability of that identification has been previously tested and has resulted in a positive identification of the defendant. The source of the witness's trial testimony is not what they viewed during the prior identification, but rather on what they observed during the course of the crime. That rule flows logically from our case law on wrongful convictions and out-of-court identifications, while according with a defendant's rights to due process and a fair trial (*see* sections I.A, II.A, supra).

For example, if a witness claims they saw the perpetrator of the crime and can identify them if they saw them again, but the witness is a stranger to the defendant, then a nonsuggestive pre-trial identification is required. In contrast, if the witness knows the defendant—as in the case of a relative, friend, or someone who has observed them over some period of time, in circumstances unrelated to the crime—then they can be asked for the first time in court if they can identify the person they saw commit the crime (*see People v Dixon*, 85 NY2d 218, 223-224 [1995] [explaining that a *Wade* hearing is not required where a witness "is familiar with the perpetrator because that witness will naturally be 'impervious to police suggestion' "], citing *People v Rodriguez*, 79 NY2d 445, 450 [1992] [a "confirmatory identification" is "tantamount to a conclusion that, as a matter of law, the witness is so familiar with the defendant that there is 'little or no risk' that police suggestion could lead to a misidentification"]). However, familiarity from a prior "brief encounter" is insufficient exposure to a suspect and not much more reliable than a stranger's identification (*Rodriguez*, 79 NY2d at 450).

Several sister jurisdictions have adopted rules that protect against these first-time in-court identifications. In *Crayton*, the Supreme Judicial Court of Massachusetts held that "[w]here an eyewitness has not participated before trial in an identification procedure, [the court] shall treat the in-court identification as an in-court showup, and shall admit it in evidence only where there is 'good reason' for its admission" (470 Mass at 241, 21 NE3d at 169). Good reason may exist, for example, "where the eyewitness was familiar with the defendant before the commission of the crime" or "where the witness is an arresting officer who was also an eyewitness to the commission of the crime, and the identification merely

confirms that the defendant is the person who was arrested" (*id*., 470 Mass at 242, 21 NE3d at 170). The Court made clear that it would not "place[] the burden on the defendant to . . . propos[e] alternative, less suggestive identification procedures" because doing so would suggest that the prosecution "is entitled to an unnecessarily suggestive in-court identification unless the defendant proposes [an] alternative that the trial judge in [their] discretion adopts" (*id*., 470 Mass at 241, 21 NE3d at 169). Instead, the prosecution must move in limine to proceed with an in-court identification where there has been no out-of-court procedure (*id*., 470 Mass at 243, 21 NE2d at 170-171).

Two years after *Crayton*, the Supreme Court of Connecticut went a step further in *Dickson*, holding that a prosecutor must seek advance permission from the trial court before presenting a first-time in-court identification, and the court may grant that permission *only* if "there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue" (322 Conn at 446, 141 A3d at 835-836). Most recently, the Supreme Court of New Jersey followed *Crayton*'s approach, holding in *Watson* that a first-time in-court identification can be conducted only when there is "good reason" for it (254 NJ at 568, 298 A3d at 1055). Procedurally, the prosecution "must give fair notice to the defense" before attempting to elicit such an identification and must file a motion in limine to establish "good reason" (*id*., 253 NJ at 568, 588, 298 A3d at 1055, 1066). The *Watson* Court noted that it "does not make sense" to require the defendant to file a motion to suppress in these circumstances because "only the prosecution knows whether it will ask a witness to make an identification in court" (*id*., 254 NJ at 588, 298 A3d at 1066).

The "good reason" requirement recognized by these courts ensures that the in-court identification is merely confirmatory or is reliable because it is not solely based on the memory of the crime but on some additional source of familiarity with the defendant (*Crayton*, 470 Mass at 241, 21 NE3d at 169; *Watson*, 253 NJ at 568, 588, 298 A3d at 1066). As with the approach adopted by our sister jurisdictions, my rule similarly protects defendant's rights and furthers the truth-seeking function of the trial.

## III.

This appeal perfectly illustrates why we must prohibit first-time, in-court identifications. Defendant's trial features the State's pre-testimony failures and the suggestiveness factors that researchers and legal scholars have roundly identified as leading to unreliable identifications.

## A.

According to the trial testimony, victim CC attended a small house party with two female friends and two other individuals. CC did not know defendant prior to seeing him for the first time earlier that evening. CC consumed approximately two pints of liquor and at some point, left with his two friends to buy more alcohol. When they returned, one of the women nicknamed "Nita" told him to stay outside. CC wanted to retrieve some personal belongings from the house, so he started "banging on the door." Nita opened the door but blocked the entrance, and an argument and "pushing match" ensued. CC spilled some of

his liquor and in frustration, poured the rest of the bottle on Nita. Eventually, CC retrieved his belongings and walked outside, continuing to verbally argue with Nita and one of the other men present. Another man walked outside and shot CC in the leg with a revolver. CC crawled to his car and put a tourniquet on his leg. His friends then drove him to the hospital, where he underwent surgery. Hospital records indicated that CC initially told doctors that he "threw a drink on a girl and she shot him in the leg." He testified that he did not recall making that statement. He also identified defendant as the person who shot him.

Police recovered surveillance footage from a nearby building which the prosecution played for the jury. The video does not depict the shooting but shows CC crawl across the street to his vehicle with two other individuals who then drive him away. The video also shows a black male wearing a white cap enter the video frame and look towards CC before entering a silver Chevy Equinox and driving away.

The morning after the incident, a police officer spoke with CC at the hospital. CC indicated he did not see who shot him and declined to give any further statement at that time. Several days later, CC told an investigator that the shooter was a "black male in his twenties" who went by the nickname "Killa." The investigator searched the name "Killa" in a police database which yielded defendant's name among several others. He then searched defendant's name in another database, which showed defendant being stopped in "several vehicles registered to the same female," one of which was the same make and color as the one in the crime scene surveillance footage. Police records contained a phone number for defendant which was linked to a Facebook page with the name "Killasquad."

Thereafter, police stopped and arrested defendant in a silver Chevy Equinox with a license plate matching the number listed in the database.

The prosecution then called SH, who testified that she lived in the apartment above the house party and was woken up by the sound of an argument between a male and a female. She went to look through her bedroom window, from where she could see the stairs descending from the porch below but could not see the porch itself. The area was illuminated by floodlights. SH stated that she saw a "black male" who was "almost six feet tall," "dark-skinned," with "a mustache, goatee, [and] white cap," wearing "gray jeans" and "white sneakers." She saw the man remove a gun from his pocket and heard a "pop," then saw the victim drag himself to his car and the shooter pocket the gun, walk to a silver SUV, and drive away. She immediately called 911 to report the incident, and the 911 recording was entered into evidence and played for the jury. On the call, SH can be heard telling the operator that the shooter was leaving in a "light silver truck" and describing him as a black man in a white cap, gray pants, and white sneakers. Police followed up with SH about the incident when she confirmed that she could identify the shooter if she saw him again, and that conversation was captured by the responding officer's body-worn camera. However, the police conducted no identification procedure with SH.

On the stand, the prosecution asked SH if she could identify the individual she saw shoot the victim. Defense counsel objected and the court inquired whether there had been any prior identification procedure. The following ensued outside the presence of the jury:

THE COURT: Is she going to identify the defendant?

[PROSECUTOR]: I don't know.
[DEFENSE COUNSEL]: No.
THE COURT: So where in the hell did you get her? I mean, has anybody talked to her before?
[PROSECUTOR]: The officer testified she spoke to her that night.
THE COURT: Okay. But did she tell that cop that night that she could ID?
[PROSECUTOR]: Yes, she did.
THE COURT: And nobody went back and did an ID with her?
[PROSECUTOR]: Correct, your Honor.
THE COURT: So her name and her information is in the police reports?
. . .
THE COURT: And [she] said, "I can ID"?
[PROSECUTOR]: Yes, your Honor.
THE COURT: Okay. Boy, that – forgive me, but that's not really good police work.

The court allowed the prosecution to ask SH to identify the shooter, noting that the identification would be subject to cross-examination. SH identified defendant.

In sum, a witness observed the shooting that led to defendant's arrest and the witness informed the police on the day of the crime that based on those observations she could identify the shooter. The police and prosecutor inexplicably failed to conduct a pre-trial identification procedure to test the reliability of the witness's assertion. Instead, at trial, the prosecutor called the witness to the stand and, after some preliminary questions, asked her—without prior notice to the court or defendant—if the shooter was in the courtroom. By that point, the witness had observed defendant sitting next to his lawyer. The obvious inferences were that defendant was the person the witness had observed commit the crime and that the State of New York chose to prosecute defendant because it was convinced of

his guilt. The prosecutor might as well have pointed a finger at defendant. No action by counsel or the trial court could mitigate the impact on the witness of this courtroom scene. Nor could counsel effectively cross-examine this witness who was certain of what they saw, even though the circumstances of the identification during the crime and in the courtroom may render it unreliable. The only remedy once the witness had taken the stand and observed the defendant in the courtroom was to declare a mistrial.

IV.

I disagree with the majority that defendant here received adequate notice that SH would be asked to make a first-time, in-court identification merely because defense counsel was provided a copy of the body camera footage during which SH told the police that she could identify the shooter. First, at the time of the crime SH never said defendant was the shooter, which of course she could not because she never claimed to personally know the shooter or defendant. Second, defense counsel—like the court here—would have expected, based on the witness's declaration that SH could identify the shooter, that the police— following good practice—would have conducted a pre-trial identification procedure with her. When counsel was not advised of such procedure as CPL 710.30 requires, counsel rationally could have assumed that the State was not confident in SH's ability to identify the shooter and therefore did not conduct a pre-trial procedure with her. Under these circumstances, defense counsel cannot be faulted and defendant should not be prejudiced for operating on the assumption that, even if the prosecutor called SH to provide

information regarding the events she observed and to describe the person she claimed she saw shoot the victim, the prosecutor would not risk a potentially damaging negative response from SH and thus would not ask her to identify the shooter in court. Thus, here, contrary to the majority's conclusion, defendant is not foreclosed from challenging the lack of a pre-trial procedure (*see* majority op at 8).[10]

The majority further concludes that the court did not abuse its discretion in denying defendant's request to preclude SH's testimony because "the witness's identification was far from the only evidence linking defendant to this crime" (majority op at 9). But that evidence was not without its weaknesses and depended on CC, who admitted he was drinking heavily and who told the hospital staff that a woman he was arguing with shot him. SH's identification thus bolstered CC's conflicting trial testimony that defendant was the shooter.

---

[10] The majority's conclusion that defendant was aware that the witness might be asked to identify the perpetrator would require that defense counsel have made the following sequential assumptions: first, the completely fair assumption that the prosecutor complied with its obligations under *Brady* and the CPL; second, that, notwithstanding the lack of notice that the witness in fact identified defendant or failed to do so, the prosecutor might still ask the witness to make a first-time, in-court identification; and third, that the prosecutor believed, based on some other unrevealed information, that the witness would identify defendant as the shooter or that the prosecutor would pose the identification question to the witness without knowing whether they could identify defendant. As to the second assumption, counsel could reasonably assume the prosecutor would rather avoid the risk that SH would fail to identify defendant before the jury. And for the third assumption to hold, counsel would have to assume the prosecutor was withholding information or that they would act in contravention of a fundamental tenet of trial practice that you should never ask a question to which you do not already know the answer (*see* Irving Younger's 10 Commandments of Cross Examination, Litigation Monograph Series No. 1, ABA Annual Meeting [1975]). None of these assumptions are reasonable and thus cannot support the majority's conclusion that defense counsel was on notice.

Regardless, the quantum of evidence is quite beside the point. Whether measured by its independent impact on the jury or by how it may have shored up the prosecution's other witness, it is still the case that SH identified defendant under circumstances that the majority recognizes as dangerous (*see* majority op at 10). Furthermore, the trial court admitted the identification testimony not because the court was persuaded of its reliability—indeed, the court chided the prosecutor for the police's failure to conduct a pre-trial procedure and was surprised by the prosecutor's uncertainty as to whether SH would identify defendant—but because the court concluded defense counsel would have the opportunity to cross examine SH. But as the majority acknowledges, cross-examination is insufficient to eliminate this type of suggestiveness (majority op at 6).

As this Court has declared, "[t]he appellate courts have an overriding responsibility, never to be eschewed or lightly to be laid aside," to give assurance to the public "that there shall be full observance and enforcement of the cardinal right of a defendant to a fair trial" (*People v Crimmins*, 36 NY2d 230, 238 [1975]).

> "[I]f in any instance, an appellate court concludes that there has been such error of a trial court, such misconduct of a prosecutor, such inadequacy of defense counsel, or such other wrong as to have operated to deny any individual defendant his fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial, quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction. The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (*id.*; *see also People v Mayo*, 48 NY2d 245, 252 [1979] ["[T]here are some errors of constitutional magnitude that are so fundamental that their commission serves to invalidate the entire trial. These errors

are simply not amenable to traditional harmless error analysis"], citing *People v Felder*, 47 NY2d 287 [1979]).

The admission of SH's testimony presents a risk of wrongful conviction and constitutes an error of constitutional magnitude that violated defendant's freestanding right to a fair trial. Thus "without regard to any evaluation as to whether the error[] contributed to [] defendant's conviction," our law instructs that the conviction cannot stand (*Crimmins*, 36 NY2d at 238). Therefore, I would reverse and grant defendant a new trial.

Order affirmed. Opinion by Judge Singas. Chief Judge Wilson and Judges Garcia, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.

Decided December 14, 2023